**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | | |
|---|---|---|
| JUSTIN MINGLE, | : | |
| | : | |
| Plaintiff, | : | Civil No. 22-5832 (RBK) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court on the appeal filed by Plaintiff Justin Mingle from

the decision of the Commissioner of the Social Security Administration (the "Commissioner")

denying Plaintiff disability insurance benefits and supplemental security income and Mingle's

Motion for Judgment on the Pleadings (the "Motion") (ECF No. 9). For the reasons set forth

below, the Court **AFFIRMS** the Commissioner's decision. The Court therefore **DENIES**

Mingle's Motion.

## I.       BACKGROUND

### A.       Procedural History

On May 10, 2021, Mingle filed applications with the Social Security Administration (the

"Administration") for disability insurance benefits and supplemental security income, alleging he

became disabled on January 14, 2020. (R. at 108–09). The Administration initially denied

Mingle's claims on September 15, 2021. (*Id.* at 131). Mingle appealed for reconsideration of that

decision, and the Administration denied Mingle's request for reconsideration on November 16,

2021. (*Id.* at 147). The next day, November 17, 2021, Mingle requested a hearing before an

1

administrative law judge ("ALJ"). (*Id.* at 154). Represented by counsel, Mingle appeared before the ALJ on March 18, 2022 for a telephonic hearing. (*Id.* at 48, 50). On May 27, 2022, the ALJ found that Mingle was not disabled within the meaning of the Social Security Act. (*Id.* at 27–28). Mingle appealed the ALJ's decision to the Appeals Council the same day, and they denied Mingle's request for review on August 17, 2022. (*Id.* at 1, 213–14). On October 1, 2022, Mingle appealed the matter to this Court. (ECF No. 1).

### B.   Plaintiff's History

#### 1.   General Background and Dr. McCarthy

Mingle was born on June 7, 1994. (R. at 26, 108–09). He graduated from college with a Bachelor of Science in Nursing and previously worked as a general duty nurse and nurse aide. (*Id.* at 26, 58). Mingle initially claimed his disability onset date was January 14, 2020, but he later amended that date to November 16, 2019. (*Id.* at 12, 108–09).

Mingle has been dealing with his mental health issues even before his alleged onset date. (*Id.* at 67–68). Eventually his symptoms reached a point where he felt compelled to seek medical help. (*Id.* at 67). On October 29, 2019, he reported to his family practitioner, Dr. Jennifer McCarthy, that he was experiencing what he believed to be obsessive-compulsive behaviors— such as repetitive checking of the stove, doors, and light switches—that were interfering with his life. (*Id.* at 376). Dr. McCarthy referred him for a psychiatric evaluation. (*Id.* at 378).

His last day working as a nurse, November 16, 2019, was not long after this initial appointment with Dr. McCarthy. (*Id.* at 1097). Mingle called out from work from November 17, 2019 until he resigned on December 17, 2019. (*Id.*). Two days after he resigned, Mingle returned to Dr. McCarthy reporting worsening anxiety and OCD symptoms. (*Id.* at 380). Dr. McCarthy's notes show that Mingle improved for a day while on 20mg of Prozac, but he had not yet started

2

Klonopin. (*Id.*). The notes also say that Mingle was seeing a therapist, though he made only one appointment. (*Id.*). Dr. McCarthy increased Mingle's Prozac to 40mg daily, added 0.5mg Klonopin, and noted that Mingle "needs to get back to therapy asap." (*Id.* at 381). At a follow-up appointment with Dr. McCarthy on February 13, 2020, Dr. McCarthy noted that "things are going a lot better now": Mingle had seen a psychiatrist two days earlier, he was now on 80mg of Prozac, he was weaning himself off Klonopin with psychiatric guidance, and he was clear minded with better energy. (*Id.* at 384). She also noted that Mingle's OCD was stable, and his anxiety had improved. (*Id.* at 385).

### 2.  Dr. Schacht

The psychiatrist Mingle saw between appointments with Dr. McCarthy was Dr. Edward Schacht, who Mingle appears to have seen twice: once on January 20, 2020, and again on February 11, 2020. (*Id.* at 332, 334). At the first visit, Dr. Schacht recounted some of the history above and noted that his medication at that time was successfully helping him sleep. (*Id.* at 334). He also noted that Mingle reported "repetitive thoughts and checking compulsions dominating his thinking life." (*Id.*). At the same time, Dr. Schacht noted that Mingle, while in "some degree of anxiety and distress" was also "alert, oriented, friendly, [and] cooperative." (*Id.* at 336). He also noted that Mingle had a full range of mood and affect albeit coupled with preoccupation with his obsessive and anxious thoughts. (*Id.* at 337). Finally, he noted that Mingle was negative for hallucinations, delusions, paranoia, suicidal or homicidal ideations and that his judgment was intact but influenced by his OCD and anxiety. (*Id.*). At Mingle's second visit, Dr. Schacht reported him as cooperative, alert, and oriented with an appropriate affect, a goal-directed thought process, low impulsivity, and socially adequate judgment, but with loud speech and increased psychomotor activity. (*Id.* at 332).

3

### 3.       Ashley Anderson, Advanced Nurse Practitioner

After he moved from Pennsylvania to New Jersey, Mingle sought out a new mental health provider, and on September 1, 2020, he met with Ashley Anderson, an advanced nurse practitioner, for an initial psychiatric evaluation over the phone. (*Id.* at 401, 409). Anderson reported that Mingle had normal speech, calm and cooperative behavior, normal psychomotor activity, a normal mood, adequate attention, and a normal thought process. (*Id.* at 405). Anderson put Mingle on a medication management plan and seemingly recommended a referral for psychotherapy, but Mingle refused. (*Id.* at 408–09).

Around the same time, in September 2020, Mingle attempted to return to work, but he was unable to complete orientation or adequately fulfill the job's duties, so he resigned within a month. (*Id.* at 63). At a follow-up appointment with Anderson on January 16, 2021, Mingle stated that his mental health was "much better with the adjustments." (*Id.* at 393). Mingle reported that his mood improved greatly, he had better attention and focus with an increased dose of Adderall and a separate medication, Buspar, was helping to cause less anxiety. (*Id.*). It was also noted that, again, Anderson "strongly advised" Mingle to start psychotherapy. Mingle deferred it because he had done some therapy in the past, and he did not believe it was effective. (*Id.* at 398).

### 4.       Dr. Pradhan

Before that January 2021 follow-up with Anderson, on November 23, 2020, Mingle had his first video session with psychiatrist Dr. Basant Pradhan. (*Id.* at 931–51). At that initial visit, Dr. Pradhan noted that Mingle had "clear OCD mixed thoughts and acts" of a moderate severity with no significant physical symptoms. (*Id.* at 938). Dr. Pradhan also made notes that Mingle had no tics or tremors, he was alert, pleasant, and cooperative, and had no formal thought disorder,

but he did have slightly increased psychomotor activity, an anxious mood, and he was easily distracted (which he bolded) and could have a better attention span and concentration. (*Id.* at 943). He graded Mingle with a GAF score—a score used by mental health professionals to assess an individual's ability to function—of 51–60 for moderate symptoms, recommended regular psychotherapy and medication management sessions, and prescribed Mingle 70mg Prozac daily, 20mg Adderall daily, and 0.5mg Klonopin every other day. (*Id.* at 944–45).

Mingle had many follow-ups with Dr. Pradhan during the next year: February 1, 2021; April 12, 2021; April 30, 2021; May 19, 2021; June 14, 2021; July 28, 2021; August 9, 2021; August 25, 2021; September 1, 2021; September 15, 2021; October 4, 2021; and November 8, 2021. At the February appointment, Dr. Pradhan noted much the same about Mingle that he did during his initial visit in November, but he noted that Mingle was overall "improving with meds." (*Id.* at 920). He then assessed Mingle the same GAF score and started Mingle on Buspar. (*Id.* at 926–27). At the April 12, 2021 session, Dr. Pradhan simultaneously noted that Mingle was "having worsening of symptoms of OCD mixed thoughts and act" but also assigned him a lower overall severity score of six out of ten as compared to an initial score of seven out of ten. (*Id.* at 899). Otherwise, his notes remained mostly the same as before, and he assigned Mingle the same GAF score. (*Id.* at 905–06). The April 30, 2021 appointment was mainly to address Mingle's interest in replacing his Klonopin with medical marijuana. (*Id.* at 879). Dr. Pradhan recommended a consultation with a different doctor. (*Id.* at 879–80).

At the May 19, 2021 appointment—their first in-person meeting—Mingle started reporting exacerbated and worsening symptoms. (*Id.* at 858–59). Mingle stated that he was "almost house-bound" due to agoraphobia. (*Id.* at 858). Dr. Pradhan put his OCD score at an all-time high. (*Id.*). Although he graded Mingle the same GAF score, his report noted that Mingle

5

was "**very** anxious[,]" had tremors, had slightly increased psychomotor activity, and had severely impaired functioning status. (*Id.* at 864–65 (emphasis in original)). Dr. Pradhan changed his medications and increased Mingle's visits to monthly. (*Id.* at 858).

Dr. Pradhan noted at the June 14, 2021 visit that Mingle continued with acute exacerbation of his OCD. (*Id.* at 822). Mingle reported that he was mostly house bound still due to his symptoms. (*Id.*). Dr. Pradhan "counseled [Mingle] on need for a therapist for [e]xposure and response [p]revention sessions for OCD and phobia." (*Id.*). He also adjusted Mingle's medications. (*Id.*). At his July 28, 2021 visit, Mingle showed slight improvements and "[s]tarted to get out of the house a bit[.]" (*Id.* at 791). His mental status exam and GAF remained the same as the previous visit, though Dr. Pradhan now noted poor hygiene. (*Id.* at 791, 806–07). Dr. Pradhan made similar notes of improvements to his anxiety, OCD, and hygiene, continued recommendations to see a psychotherapist, and the same GAF score during the August 9, August 25, September 1, and September 15, 2021 hearings. (*Id.* at 672–91, 702–21, 732–52, 763–81). For the first time, however, with seemingly no real explanation and despite similar notes of improvement during the past month-plus, at the September 15, 2021 session Dr. Pradhan lowered Mingle's GAF score to 45-50 for severe symptoms. (*Id.* at 689).

Dr. Pradhan's notes for the October 4, 2021 session show facial tics, Mingle claimed he spends more than three hours per day dealing with his OCD behaviors, and a GAF score that remained at 45-50. (*Id.* at 642, 659). The notes, however, also state that Mingle's attention span and concentration were "poor still but improving[,]" his mood was somewhat better, and he was overall better with his anxiety. (*Id.* at 642, 658–59). As to their final session on November 8, 2021, we find it best to quote Dr. Pradhan's notes directly:

> Today [Mingle requested] me to fill out paperwork for fiance's FMLA: I explained
> that I'm not familiar with this and will need some time to do it. He became rude

6

and used unprofessional language and became rude verbally and used taunts. Of note, in 10/2021, I have filled disability paper work for him by finding extra-time for him to advocate for him but he thinks I'm not helping him at all. Despite his severe conditions, he has not seen any therapist yet despite my repeated referrals since last 6-months including today. He e-mails me [on] weekends, becomes demanding on me and also on staff (front desk). . . . Better with his anxiety but still experiences tics in mouth . . . . A bit more improved . . . on OCD [symptoms] as well with my treatment but due to lack of participation in exposure and response prevention therapy, he still continues with OCD and Phobia symptoms despite my best interventions. . . . Not interested to see me in-person despite my recommendations that it will help more on OCD if he comes in-person. . . . Improved a bit on earlier poor hygiene; confidence a bit better. . . . [H]e reports he doesn't trust me. . . . On 11/8/21, I have provided him therapist resources again and offered him to see another psychiatrist if he doesn't trust me.

(*Id.* at 1090–91).

Prior to the end of his relationship with Mingle, on October 27, 2021, Dr. Pradhan filled out a Mental Medical Source Statement on Mingle's behalf. (*Id.* at 528–33). The document notes that Mingle suffers from severe obsessions and compulsions; he spends four hours per day "in these symptoms"; he has severe depression symptoms; he has a poor prognosis "despite good adherence to medications, therapy & psychosocial recommendations"; Mingle feels persistently hopeless; he is seriously limited in maintaining attention for two-hour segments, sustaining an ordinary routine without special supervision, completing a normal workday or week without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods; and Dr. Pradhan estimated Mingle would miss more than four work days per month due to impairment or treatment. (*Id.* at 528, 530, 532).

It is also worth noting a few other points in the documents. First, Dr. Pradhan said that Mingle was limited but satisfactory in understanding and remembering very short and simple instructions; carrying out very short and simple instructions; maintaining regular attendance and being punctual within customary, usually strict tolerances; making simple work-related decisions; accepting instructions and responding appropriately to criticism; and getting along

with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (*Id.* at 530). Second, Dr. Pradhan listed Mingle's current GAF score at 35 and his highest GAF score during the past year at 45 despite Dr. Pradhan never issuing a GAF score on Mingle's treatment notes lower than 45 and consistently scoring him at 51–60 during the previous year. (*Id.* at 528). Dr. Pradhan's treatment notes also specifically mention that Mingle denied hopelessness throughout their sessions, including on October 4, 2021 at the most recent recorded session prior to the creation of this document. (*See, e.g., id.* at 642–43, 703, 763, 793).

### 5.   Dr. Resnikoff

On August 24, 2021, Dr. AnnaMarie Resnikoff performed a one-time telehealth evaluation of Mingle at the behest of Disability Determination Services to produce a consultative report. (*Id.* at 427, 430). Much of the report is a summary of what Mingle himself reported during the conversation: chronic pain from head to feet; not showering weekly; other psychosomatic pain related to anxiety; agoraphobia; suicidal thoughts but no attempts or plans; and that his daily compulsions can take three to eight hours from his day on average. (*Id.* at 427–28). The report also notes that Mingle can wake up on his own; he responded to and solved three out of four simple numerical calculations and three out of four simple word problems; recalled forty percent of common objects asked to identify in the room after a five-minute time lapse; and he has poor concentration and attentions skills. (*Id.*).

### 6.   Administrative Medical Examiners

Two medical consultants reviewed Mingle's records and treatment notes and provided their own analysis based on those records for disability determination. First, on September 10, 2021, psychologist Dr. Jocelyn Fierstein reviewed reports from Dr. Resnikoff, Dr. Schacht, Dr. McCarthy, Dr. Pradhan, and APN Anderson. (*Id.* at 93). Based on her review, Dr. Fierstein

found that Mingle was not significantly limited in ten limitations including: his ability to remember locations and work-like procedures; his ability to understand and remember very short and simple instructions; his ability to carry out very short and simple instructions; his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and his ability to accept instructions and respond appropriately to criticism from supervisors. She also found that Mingle was moderately limited in ten limitations including: his ability to understand and remember detailed instructions; his ability to maintain attention and concentration for extended periods; and his ability to work in coordination with or in proximity to other without being distracted by them. (*Id.* at 96–97). According to Dr. Fierstein, Mingle did not have any greater limitations. Based on her review, Dr. Fierstein found that Mingle "is able to perform basic tasks, sustain [concentration, persistence, and pace], [and] relate and adapt to low stress or low contact work-like settings. (*Id.* at 98).

Dr. Alexander Golin then reviewed an updated record on November 15, 2021, which now included Dr. Pradhan's Mental Medical Source Statement and notes from Mingle's October 4 and November 8, 2021 sessions with Dr. Pradhan. (*Id.* at 110–12). Dr. Golin found Dr. Pradhan's opinion not supported by the evidence in the record, "which renders it less persuasive." (*Id.* at 114). He then affirmed Fierstein's findings and opinions. (*Id.* at 113–16).

### 7.    Mathias O. Ologbosele, APN

Finally, in January 2022, Mingle began seeing Mathias O. Ologbosele, APN. (*Id.* at 601). At that initial meeting, Mingle reported that he was depressed, had memory loss and difficulty concentrating, and suffered from phobias, unexplained fears, anxiety, and insomnia. (*Id.* at 603). Ologbosele's exam and observations show that Mingle: was cooperative; had a normal, tranquil mood; had no abnormal thought content and his thought process was appropriate; was alert; had

intact concentration and attention, though he was inattentive and lacked focus for a few periods during the interview; he had a flat, depressed affect; and he had no memory impairment. (*Id.* at 604). A little more than a month after his ALJ hearing, Mingle returned to Ologbosele on April 26, 2022. (*Id.* at 1177). During that session, Mingle "reported extreme difficulty concentrating on doing something for ten minutes, remembering to do important things, analyzing and finding solutions to problems in day-to-day life, learning a new task, and starting and maintaining a conversation and severe difficulty generally understanding what people say." (*Id.*). He also reported extreme difficulty in many other areas of functionality. (*See, e.g.*, *id.*). Mingle did report, though, that during the past seven days he felt mildly happy, mildly to moderately enthusiastic, mildly resilient, and not at all to mildly optimistic. (*Id.* at 1178). Mingle also started reporting that, since his disability hearing, he has had thoughts that he "would be better off dead[.]" (*Id.* at 1178–79). Ologbosele's exam noted a sad, depressed, and anxious mood as well as a fearful, anxious, sad, and depressed affect, but was otherwise similar to the previous exam. (*Id.* at 1179).

Like Dr. Pradhan, Ologbosele filled out a Mental Impairment Medical Source Statement for Mingle. (*Id.* at 1189–92). That statement reported, among other things, that Mingle had a depressed mood; persistent or generalized anxiety; abnormal affect; feelings of guilt or worthlessness; suicidal ideations; difficult thinking or concentrating; easy distractibility; poor memory; anhedonia; social withdrawal or isolation; and recurrent panic attacks. (*Id.* at 1189–90). Ologbosele marked all Mingle's limitations for understanding and memory, concentration and persistence, social interactions, and adaptation either as extreme ("Symptoms constantly interfere with ability (Constant – more than 2/3 of an 8-hour workday)") or unknown. (*Id.* at 1190–91). He noted that, in his opinion, Mingle would be "off-task" twenty-five percent or more of a

typical workday, and he would anticipate that Mingle's impairments or treatment would cause more than four absences a month. (*Id.* at 1192).

### C.      The ALJ's Decision

At step one, the ALJ found that Mingle had not engaged in substantial gainful activity since Mingle's amended alleged onset date, November 16, 2019. (*Id.* at 15). At step two, the ALJ found that Mingle suffered from four severe impairments: major depressive disorder, anxiety disorder, obsessive–compulsive disorder, and attention deficit hyperactivity disorder (ADHD). (*Id.* at 16). The ALJ found that these impairments significantly limited Mingle's ability to perform basic work-related activities. (*Id.*). At step three, the ALJ found that none of Mingle's four severe impairments met or medically equaled the severity of any listed impairment under 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*). Specifically, the ALJ found that "considered singly and in combination, [Mingle's severe impairments] do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.11." (*Id.* at 17). The ALJ considered all four functioning factors and found that Mingle had (1) no limitations in understanding, remembering, or applying information; (2) a mild limitation interacting with others; (3) a marked limitation with concentrating, persisting, or maintaining pace; and (4) a mild limitation with adapting or managing oneself. (*Id.* at 17–19).

At step four, the ALJ formulated Mingle's RFC. (*Id.* at 20–25). The ALJ found that Mingle "has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can sustain attention and concentration for simple tasks, can interact with supervisors, general public, and coworkers appropriately for simple tasks, but must avoid work in team or tandem. Lastly, he can adapt to minor and infrequent changes to task." (*Id.* at 20). The ALJ explained that Mingle's "statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id.* at 21).

The ALJ considered many different parts of the record during her analysis. To begin, the ALJ said she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence [in the record]" as well as "the medical opinion(s) and prior administrative medical finding(s)." (*Id.* at 20). The ALJ also considered treatment notes from doctors who conducted Mingle's many treatments and evaluations. (*Id.* at 20–25). Specifically, in her written decision, the ALJ discussed notes and evaluations by: (1) Dr. Schacht; (2) Dr. Resnikoff; (3) APN Ologbosele; (4) Donald Barone, DO (neurologist); (5) Dr. Pamela Traisak, M.D.; (6) Dr. James Paolino, M.D. (state agency medical consultant); (7) Dr. Fierstein; (8) Dr. Golin; and (9) Dr. Pradhan. (*Id.* at 21–25). She concluded her discussion of Mingle's RFC by noting that her decision was based on her review of "the complete record, consideration of all opinions within the record, consideration of the testimony of the claimant, and consideration of the claimant's severe and non-severe impairments[.]" (*Id.* at 25). She ultimately found that Mingle's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id.* at 21).

After constructing the RFC, the ALJ concluded step four by finding that Mingle is unable to perform any past relevant work. (*Id.* at 25). At the fifth and final step, based on all the above as well as testimony from a vocational expert, the ALJ found that, based on Mingle's age, RFC, education, and prior work experience, there are jobs that exist in significant numbers in the national economy that Mingle can perform. (*Id.* at 26). In particular, the ALJ agreed with the vocational expert that Mingle could perform the functions of a commercial cleaner, a laundry

laborer, and a "laborer stores[.]" (*Id.* at 27). Accordingly, the ALJ concluded that Mingle was not disabled. (*Id.*).

## II.    LEGAL STANDARD

### A.    Sequential Evaluation Process

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses an established five-step evaluation process to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520.

For the first four steps of the evaluation process, the claimant has the burden of establishing her disability by a preponderance of the evidence. *Zirnsak v. Colvin*, 777 F.3d 607, 611–12 (3d Cir. 2014). First, the claimant must show that she was not engaged in "substantial gainful activity" for the relevant time period.  20 C.F.R. § 404.1572. Second, the claimant must demonstrate that she has a "severe medically determinable physical and mental impairment" that lasted for a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. Third, either the claimant shows that her condition was one of the Commissioner's listed impairments, and is therefore disabled and entitled to benefits, or the analysis proceeds to step four. 20 C.F.R. § 404.1420(a)(4)(iii). Fourth, if the condition is not equivalent to a listed impairment, the ALJ must assess the claimant's residual functional capacity ("RFC"), and the claimant must show that she cannot perform her past work. 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404.1520(e). If the claimant meets her burden, the burden then shifts to the Commissioner for the last step. *Zirnsak*, 777 F.3d at 612. At the fifth and final step, the Commissioner must establish that other available work exists that the claimant can perform

based on her RFC, age, education, and work experience. 20 C.F.R. § 404.1520 (a)(4)(v); *Zirnsak*, 777 F.3d at 612. If the claimant can make "an adjustment to other work," she is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v).

### B.   Review of the Commissioner's Decision

This Court reviews the ALJ's application of the law *de novo* and the ALJ's factual findings under a "substantial evidence" standard. *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91 (3d Cir. 2007) (citing 42 U.S.C. 405(g); *Williams v. Sullivan*, 970 F.3d 1178, 1182 (3d Cir. 1992); *Mounsour Med. CR. v. Heckler*, 806 F.3d 1185, 1191 (3d Cir. 1986)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *See*, *e.g.*, *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). Courts may not set aside the Commissioner's decision if it is supported by substantial evidence, even if this Court "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

When reviewing a matter of this type, this Court must be wary of treating the determination of substantial evidence as a "self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). This Court must set aside the Commissioner's decision if it did not take into account the entire record or failed to resolve an evidentiary conflict. *See Schonewolf v. Callahan*, 972 F.Supp. 277, 284–85 (D.N.J. 1997) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)). Evidence is not substantial if "it really constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created

by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153

(3d Cir. 1983) (citing *Kent*, 710 F.2d at 110, 114). Still, "the threshold for [substantial]

evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

## III.   DISCUSSION

Mingle presents three arguments for reversal: (1) when formulating Mingle's RFC, the

ALJ failed to consider relevant medical evidence; (2) the ALJ failed to provide a logical RFC

assessment when evaluating Dr. Golin's opinion; and (3) the ALJ failed to properly evaluate all

the medical opinion evidence. (Mot. at 19, 24, 26). We disagree and find that substantial

evidence supports the ALJ's RFC assessment and factual conclusions.

First, we do not agree with Mingle that the ALJ failed to consider "an overwhelming

amount of relevant medical evidence" or that the ALJ "performed a grossly inadequate review of

the probative objective evidence" when assessing Mingle's RFC. (*See id.* at 19–20). To begin,

ALJs need not use a specific format or particular language when recounting their findings,

formulating an RFC, or presenting their conclusions. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d

Cir. 2004). Nor must an ALJ "discuss in its opinion every tidbit of evidence included in the

record." *Hur v. Barnhart*, 94 Fed. App'x 130, 133 (3d Cir. 2004); *see also Johnson v. Comm'r of

Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008). All an ALJ must do is provide "sufficient

development of the record and explanation of findings to permit meaningful review." *Jones*, 364

F.3d at 505 (citing *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000)).

The ALJ did that here.

Spread across six full pages, the ALJ recounted and discussed probative, relevant

evidence, treatment notes, and medical opinions that explain to us, the reviewing court, how she

came to Mingle's RFC. The ALJ did not "cherry pick" only the evidence that supported her

conclusion, nor does it appear that she ignored any contradictory evidence in the record. Instead, it appears to us that the ALJ merely chose to recount the litany of relevant medical evidence and treatment notes in the record that support a conclusion that, in his condition, Mingle can sustain focus and attention for simple tasks.

Multiple times during her RFC analysis, the ALJ recounted treatment notes that show Mingle's limitations. For example, in her discussion of Dr. Resnikoff's session with Mingle, the ALJ noted that Dr. Resnikoff concluded that Mingle "exhibited poor attention span and concentration during the interview[.]" (R. at 21). Additionally, although Mingle contests the usefulness of GAF scores, the ALJ noted the occasion Dr. Pradhan downgraded Mingle from a 51–60 (which Mingle scored during almost all his sessions with Dr. Pradhan) to a 45–50 due to Mingle's exacerbated symptoms. (*Id.* at 22). Further, the ALJ discussed how both Dr. Fierstein and Dr. Golin "opined that [Mingle] has severe anxiety and depression." (*Id.* at 23). She even found that Dr. Golin erred when he "did not adequately consider [Mingle's] difficulty in maintaining concentration, persistence, or pace over an eight-hour workday." (*Id.* at 24). The ALJ agreed that Mingle suffers from severe impairments that markedly impact his focus.

This shows, in our mind, an ALJ grappling with the whole record and providing "some indication of the evidence which was rejected." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). The ALJ may not have walked through every line in every treatment note which could support Mingle's disability claim, and she may not have delineated every piece of evidence she considered and rejected, but the law does not require her to do so. An ALJ must merely provide this Court with sufficient explanation to allow us to review her findings, and this ALJ did.

We have found nothing in the record that truly contradicts the ALJ's overall RFC assessment or concerns us that Mingle did not receive a fair and adequate review of his claim.

Based on our review of the record, we agree with the ALJ that, although Mingle suffers from severe mental health issues, he can still perform simple, unskilled tasks. (*See supra*, Section I.B). None of the evidence that Mingle references in the treatment notes is of such a quality that, although the ALJ did not discuss it directly, we would remand this case and require the ALJ to do so. Every social security disability case analyzed by an ALJ will have pieces of evidence that a claimant could argue supports their disability claim and which the ALJ did not specifically address in her written opinion. That does not necessarily mean that the ALJ erred. *See Hur*, 94 Fed. App'x at 133; *Johnson*, 529 F.3d at 204; *Jones*, 364 F.3d at 505.

Second, we disagree with Mingle that the ALJ's RFC assessment was illogical given her evaluation and explanation of Dr. Golin's opinion. In her analysis, the ALJ found that, based on his review of Mingle's two most recent visits with Dr. Pradhan, instead of moderate limitations, Dr. Golin should have found that Mingle has a "marked limitation in maintaining concentration, persistence, and pace[.]" (R. at 24). She did, however, agree with Dr. Golin overall that Mingle could "sustain simple work with few and infrequent changes to task." (*Id.*). Mingle quibbles with her assessment and argues that "[l]ogic would suggest that an individual with marked limitations in maintaining attention, concentration, and pace would have difficulty performing the same work that an individual with moderate limitations in maintaining attention, concentration, and pace would be able to perform." (ECF No. 12, Plaintiff's Reply Brief, "Reply" at 9). Although we perhaps agree that the ALJ's explanation could have been more thorough, we do not agree that it constitutes error that requires remand.

It is not illogical to us that the ALJ could simultaneously believe that Mingle has marked rather than moderate limitations related to concentration and maintaining attention and that, regardless, Mingle could still perform simple, basic, unskilled tasks. Although we agree with

Mingle's basic premise that one with marked limitations might have a more difficult time performing the same simple task as someone with only moderate limitations, we do not agree that such a person would be incapable of performing them at all. These are matters of degree that must be decided on a case-by-case basis. *Biestek*, 139 S. Ct. at 1157.

Again, the law does not require an ALJ to provide the most thorough explanation conceivable; it only requires that the ALJ provide sufficient explanation to permit meaningful review. *Jones*, 364 F.3d at 505. Taking the ALJ's entire RFC assessment into context, we can see how she disagreed with Dr. Golin's finding about the extent of Mingle's concentration and attention span limitations but agree with his overall conclusion. As we recounted earlier, the ALJ cited to treatment notes that spoke to Mingle's struggles with focus and concentration, and she also clearly must have reviewed the treatment notes from Mingle's final two sessions with Dr. Pradhan. At the same time, the ALJ discussed many treatment notes that showed that Mingle has no physical limitations and that he is more capable mentally than he alleges. (*See* R. 20–25). When we take her opinion in its totality, we can understand why the ALJ concluded how she did, and thus find no error on this point.

Mingle also does not cite to any case law that commands we must remand based on the ALJ's language usage here. Although in his reply brief Mingle cites to *Hess v. Commissioner of Social Security*, 931 F.3d 198, 209 (3d Cir. 2019), that case does not say that using language such as "marked" and "moderate" limitations, more commonly found during the Steps Two and Three analysis, at Steps Four or Five is an error as a matter of law. Further, *Hess* also says that a "a wide range of limitation language is permissible" at Steps Four and Five and that the "functional limitation findings [of Steps Two and Three] are plainly relevant to an ALJ's statement of the claimant's limitation at the later steps because they involve the claimant's actual

18

impairments." *Id.* Therefore, although the ALJ could have expounded further on this issue, she did not commit error by criticizing one aspect of Dr. Golin's opinion while also, after considering the whole record, agreeing with his ultimate conclusion about Mingle's ability to perform simple tasks despite his limitations.

Finally, the ALJ did not err when evaluating the medical opinion evidence. Mingle contends that the ALJ failed to properly explain the supportability and consistency (or, more accurately, the lack thereof) of Dr. Pradhan's, APN Ologbosele's, Dr. Fierstein's, and Dr. Golin's opinions. We find that substantial evidence supports the ALJ's conclusions about each of these opinions.

Substantial evidence supports the ALJ's finding that Dr. Pradhan's opinion contained in his mental medical source statement is poorly supported, inconsistent with the overall record, and therefore less persuasive overall. The law requires the ALJ to discuss and explain the supportability and consistency of a medical source's medical opinion and prior administrative medical findings. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). It does not, as Mingle repeatedly appears to indirectly argue, require that the ALJ discuss every single treatment note in the record and explain how all those treatment notes and the information contained within them weighed on her decision to find an opinion supportable (or not) and consistent (or not). *Hur*, 94 Fed. App'x at 133; *see also Johnson*, 529 F.3d at 204. What the ALJ did here allows us a chance to meaningfully review her work.

We agree with the ALJ that Dr. Pradhan's opinion in this statement is an aberration that is inconsistent with the rest of the record. As we discussed earlier in this Opinion, this statement is inconsistent with Dr. Pradhan's own treatment notes, let alone the remaining record. (*See supra* at 7–8). In just the session immediately preceding his opinion, Dr. Pradhan assigned

Mingle a GAF score of 45–50, and he noted Mingle's attention span and concentration were poor but improving, his mood was better, and his anxiety was overall better. (R. at 642, 658–59). Looking at his other sessions with Mingle, Dr. Pradhan consistently noted improvements to Mingle's mental health or at least his ability to manage it and scored him almost always at a GAF score of 51–60. (*Id.* at 672–91, 702–21, 732–52, 763–81, 791). Further, Dr. Pradhan's treatment notes specifically mention that Mingle denied hopelessness throughout their sessions including at the most recent session. (*See, e.g., id.* at 642–43, 703, 763, 793).

All of this is inconsistent with Dr. Pradhan's purported opinion that Mingle's prognosis was poor, that his current GAF score is 35 and highest within the past year is 45, and that Mingle feels persistently hopeless. Thus, it is substantial evidence that supports the ALJ's decision to find this opinion not supported by the record, inconsistent with other evidence, and therefore less persuasive. Mingle may disagree with the ALJ's assessment, and he may point to some other notes in the record that might support Dr. Pradhan's opinion, but the ALJ's decision is not rooted in error.

For the same reasons, the ALJ did not err when she found APN Ologbosele's opinion less persuasive. As detailed above and in the section of this Opinion recounting Mingle's treatment history, *see supra* at 2–11, much evidence exists in the record to support the ALJ's findings on this point. The ALJ specifically said that she found APN Ologbosele's opinion less persuasive for the same reasons she discussed when assessing Dr. Pradhan's opinion. Thus, it is fair to assume she found Ologbosele's opinion to also be inconsistent with the record. There is much in Mingle's treatment notes to support this finding, including, as the ALJ included, Ologbosele's own notes that Mingle had intact attention, concentration, and memory during their two sessions together. (R. at 604, 1179).

Last, although we agree with Mingle that the ALJ's explanations regarding Dr. Fierstein's and Dr. Golin's opinion are meager, we ultimately agree with the Commissioner that her explanations clear the low bar set by the substantial evidence standard. The ALJ does provide some explanation regarding supportability and consistency. She says their opinions are supportable because they are mental health professionals "with an understanding of the Social Security disability programs[,]" and they made references to the record throughout their opinions. (*Id.* at 24). As to consistency, the ALJ noted that Dr. Golin's opinion was not entirely consistent with the treatment notes from Mingle's last two visits with Dr. Pradhan. (*Id.*).

Although the ALJ's explanation certainly could have been more thorough, and we would urge all ALJs to be as thorough as possible in their written explanation, we must conclude that there is no legal error here. The ALJ, however briefly, did discuss supportability and consistency, and, as we have written many times, substantial evidence exists throughout the record to support her findings and conclusions.

The ALJ did not err here. She simply came to a decision adverse to Mingle. Substantial evidence supports her findings and conclusions that Mingle, though he suffers from severe impairments, is not completely disabled under the Social Security Act. As such, we affirm.

## IV.    CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision and **DENIES** Mingle's Motion. An appropriate Order follows.


Dated: August 17, 2023                           /s/ Robert B. Kugler
                                                 ROBERT B. KUGLER
                                                 United States District Judge